Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3240 | **DATE** | 3/27/2002 |
| **CASE TITLE** | Mary Maguire vs. National Railroad Passenger Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/25/2002 at 9:00 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Defendant's Motion to Bar Testimony of John Kennish [30-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | MAR 28 2002 | |
| | Notified counsel by telephone. | date docketed | 39 |
| | Docketing to mail notices. | CDY | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | courtroom deputy's initials KMc | date mailed notice | |
| | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARY MAGUIRE, | ) | |
| | ) | |
| Plaintiff, | ) No. 99 C 3240 | DOCKETED |
| | ) | MAR 2 8 2002 |
| v. | ) | |
| | ) | |
| NATIONAL RAILROAD | ) Magistrate Judge Nan R. Nolan | |
| PASSENGER CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Mary Maguire brings this personal injury matter under the Federal Employers Liability Act, claiming that her employer, the National Railroad Passenger Corp. ("Amtrak") negligently failed to provide her with a reasonably safe workplace, among other specific allegations of negligence. Maguire was injured as a result of being assaulted by a passenger while she was working as a train conductor. Maguire was in the process of boarding passengers onto an outbound train at Union Station in Chicago. As she was talking with two passengers, 63 year-old Inez Stevens hit Maguire on the back with a luggage cart. Stevens had allegedly become frustrated with the fact that Maguire was assisting the other two passengers and was ignoring her.

The matter is now before the Court on Defendant's Motion to Bar Testimony of John Kennish. Kennish, an expert in industrial and premises security, was retained Maguire to testify that Amtrak was negligent in a number of ways, including by failing to implement and enforce proper safety procedures. For the reasons that follow, Amtrak's motion is GRANTED and Kennish's testimony is barred.

1

39

## DISCUSSION

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which codified the Supreme Court's rulings in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The primary objective of Rule 702's gatekeeping requirement is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The first issue to be decided in making a Rule 702 determination is whether the proposed expert is indeed "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. To be qualified as an expert, a witness need not have any particular educational or scientific background; he may be qualified solely on the basis of practical experience. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

After an expert has been qualified as such, a court must then determine whether the expert's opinions are based upon sufficient facts or data and whether the methodology underlying the opinion is reliable. *See Smith*, 215 F.3d at 718 (holding that even a qualified expert cannot testify to opinions if those opinions are not grounded in some recognized scientific method). "'An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate [his] opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert.'" *United States v. Hall*, 93 F.3d 1337, 1343 (1996) (quoting *United States v. Benson*, 941 F.2d 598 (7th 1991)). "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst

2

is exerting undue influence on the jury that would be subject to control under Rule 403." *Hall*, 93 F.3d at 1343.

*Daubert* provided a non-exclusive, non-dispositive list of guidelines courts can use in performing its gatekeeper function of determining the reliability of an expert's methodology: (1) whether the expert's theory has been or is capable of being tested; (2) whether the theory has been subject to peer review and publication; (3) what is the theory's known or potential rate of error; and (4) whether the theory is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. *Daubert* stressed that the Rule 702 inquiry is a flexible one, and that the court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95; *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) ("*Daubert* is a flexible test and no single factor, even testing, is dispositive.").

In *Kumho Tire*, the Supreme Court expressly extended *Daubert*'s main holding to technical and other non-scientific experts. *Kumho Tire*, 526 U.S. at 141. *Kumho Tire* also reiterated *Daubert*'s warning that the *Daubert* test is flexible, and that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.*

The *Daubert* factors "are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to based his opinion merely on 'experience' or training.'" *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)) ("'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'"). In such a case, "[e]ither 'hands-on testing' or 'review of experimental, statistical, or other scientific data generated by others in the field' may suffice as a reasonable methodology upon which to base an opinion." *Id.* (citation omitted).

After finding that a qualified expert's theory is based on sufficient data and a reliable methodology, the court must then determine whether the expert's opinion is based upon a sound

3

application of the methodology to the particular facts of the case, and finally, Rule 702 requires the court to decide if the testimony is likely to assist the trier of fact.

In its motion, Amtrak argues both that Kennish is not qualified as an expert and that his opinions are not based upon reliable methodology.

### *Qualifications*

Kennish describes himself as a "generalist" in the field of premises security. (Kennish Dep. at 4-5.) Kennish's educational background includes bachelor's degrees in criminal justice and sociology and master's degrees in industrial safety and industrial security, and he has received technical training from two police academies. He has had employment experience as a police officer in major metropolitan cities, as a security specialist for a Federal Reserve Bank, and as Corporate Director of Security and Vice President of a bank, and he is now employed as an independent security consultant. Kennish has authored a number of articles relating to industrial security covering, various issues including employee theft, ATM security, loss prevention, guarding against premise security claims, violence and crime prevention. (Kennish Curriculum Vitae, Pl.'s Mem. in Opp. Ex. A.) Kennish has had personal experience in controlling large groups of people, including those who had to be managed as they moved from one place to another under stressful circumstances; and he has worked in security for public events and bank promotional events. (Kennish Dep. at 48-50.) Kennish has consulted as an expert in litigation involving security in public places, including banks, service stations, night clubs, health care facilities, shopping malls, apartment buildings, theaters, and restaurants. He has had no experience in the railroad industry aside from his consulting work in this case. (*Id.* at 34, 37-38.)

Kennish's lack of experience in the railroad industry does not, by itself, disqualify him from being qualified as an expert on the issue of premises security. He could, despite his lack of specific experience and training, produce a reliable expert analysis. *See Robb v. Burlington N. Santa Fe Ry. Co.*, 100 F. Supp. 2d 867, 872 (N.D. Ill. 2000); *cf. Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 101 (2d Cir. 1998) (upholding the district court's refusal to qualify a security expert in an airline

4

hijacking case where the expert "had never been a security officer with an American commercial airport or American airline, had never performed a threat assessment of an airport, had performed no recent consulting work, and had received no training with respect to airport or airline security.").

Moreover, even if a number of issues in the case are particular to the railroad industry, an expert need not be qualified to testify to the ultimate issue as long as he can provide some assistance to the jury with regard to any factual matter. *Smith*, 215 F.3d at 721. Therefore, this Court could be persuaded to qualify Kennish as an expert in the area of premises security. However, as will be discussed below, his failure to utilize any accepted methodology in forming his opinions makes his possible qualification as an expert irrelevant to the admissibility of his testimony.

### *Principles and Methods*

Amtrak argues that Kennish's conclusions were not based upon sufficient facts and data and that they were not the product of reliable principles and methods. Maguire counters that Amtrak's concerns relate to the weight, not the admissibility, of Kennish's testimony and that he properly based his opinions on his personal experience in the fields of safety and security.

In reaching his conclusions, Kennish generally relied on a number depositions taken in the case; Amtrak documents related to boarding policies and security procedures; and his experience, education, and qualification in the fields of security and safety. (Kennish Dep. at 11-13; Pl.'s Mem. in Opp. at 5-6.) He also visited Union Station the day before his deposition, although he did not observe boarding at the same platform or of the same train on which Maguire was working when she was assaulted. (Kennish Dep. at 19-20, 25-26.) He did not rely on photographs of the platform; 49 C.F.R. 207, which relates to railroad police officers; or any existing publications or studies; and he did not conduct any independent research or studies. (*Id.* at 15-17.) Kennish also did not do any general research of literature related to railroad operation security. (*Id.* at 39.)

In his deposition,[1] Kennish testified to a number of security failures by Amtrak, any one of which could have prevented the assault on Maguire: (1) the failure to develop and implement an effective boarding procedure that would limit the number of passengers on the platform to twenty-five or less; (2) the failure to properly hire, train, and supervise gate personnel on safety procedures; (3) the failure to deploy uniformed personnel on the train platforms while trains were being loaded and deboarded; (4) the failure to have adequate warning signage on the platforms; (5) the failure to hire a sufficient number of personnel to work on the platforms; (6) the failure to have an efficient radio communications system; and (7) the failure to have physical crowd control measures, such as barriers or stanchions.[2]

Kennish's testimony expanded on several of his conclusions. First, Kennish faulted Amtrak's loading procedures, which give gate personnel the discretion to allow more than twenty-five passengers to load at a time. (*Id.* at 45-46.) Kennish further testified that the safety procedures are ineffective because employees do not have to sign off on them and are not accountable for implementing them. (*Id.*) He claimed that there would be little cost to Amtrak to develop, implement, and enforce new procedures, but he did not state how he came to that conclusion. (*Id.* at 89-90.) According to Kennish, the presence of as many as 100 people on the platform at one time caused the assault because "Maguire was overwhelmed and essentially lost control of the situation which led to the frustration on the part of the passenger who assaulted her." (*Id.* at 47.) He concluded that allowing only twenty-five or fewer passengers on the platform would be safer. His theory was based on his personal experience in controlling large groups and on the procedures, which were "described as similar to cattle herding." (*Id.* at 48.)

---

[1] The Court was not provided with a written report, and to the Court's knowledge, Kennish did not prepare one in this case.

[2] Kennish also began to testify that a modified facility design would improve security. He admitted, however, that he had no opinion about how the facility should be modified and would not be able to form an opinion without conducting a study. (Kennish Dep. at 89-90.)

6

Kennish admitted that he has never developed or participated in any way in the development of a loading or deboarding procedure and that he read only "bits and pieces of information" related to Amtrak's loading procedure. (*Id.* at 31-34.) He did not refer to any studies of crowd control or psychology, and while he acknowledged that studies of the effect of group size on behavior have been done, he did not review any. (*Id.* at 48, 52-53.) In addition, Kennish could not quantify the increase in stress that allegedly occurs in larger versus smaller groups; he could not quantify the increased danger of criminal activity in larger groups; and he had no analysis to support his conclusion that fifty passengers onto the platform were too many to be safe. (*Id.* at 52, 106-07.) Kennish also testified that adequate crowd control measures, such as barriers, stanchions, or other queuing mechanisms would have prevented the assault. (*Id.* at 100, 108-09.)

Next, Kennish testified that the presence of uniformed security personnel and closed circuit cameras would have helped to deter the assault on Maguire. (*Id.* at 60-61, 110-11.) He stated that he was aware of the existence of studies on the effect of uniformed personnel on criminal behavior, but that he could not reference any particular studies. (*Id.* at 43-44.) He also acknowledged that he did not refer to any studies in concluding that the presence of closed-circuit cameras would have deterred Stevens from assaulting Maguire. (*Id.* at 112-14.) He further admitted that the feasibility of closed-circuit cameras would have to be studied from a cost/benefit standpoint to determine if they were justified, and that he did not know how many cameras would be needed or where they should be placed within the platform area. (*Id.* at 110-11, 115-16.)

Finally, Kennish testified that the assault could have been prevented had there been adequate warning signage on the platform and an efficient radio system that would have allowed Maguire to communicate with the gate attendant regarding the number of passengers that should have been allowed to enter the platform area. (*Id.* at 79-80, 96-98.) When asked to describe the wording of an adequate warning sign, Kennish stated, "I'm trying to think," listed some suggestions, and admitted that he would have to know the railroad operation better in order to determine what the sign should have said. (*Id.* at 103-05.) He also testified that if the facts demonstrated that Maguire did have a

7

functioning radio prior to the assault, he would have no opinion regarding the issue of the radio system. (*Id.* at 99-100.)

This Court concludes that Kennish's conclusions do not meet Rule 702 standards of reliability. Kennish did not rely on sufficient relevant facts and data, nor were his conclusions the produce of reliable principles and methods. First, Kennish did not review all of the factual evidence available to him before reaching his conclusions. He did not review photographs of the scene, he did not visit the same platform or any platform at the same time as the incident occurred,[3] and he apparently read only portions of Amtrak's security procedures. Accordingly, any conclusions he made based upon the data he reviewed are of questionable reliability.

Second, Kennish admitted that he relied only on his personal experience in reaching his conclusions. His experience may be sufficiently reliable to develop opinions about premises liability in general, but he did not explain how his previous experience in crowd control is reliable in the context of boarding a train, which common sense dictates involves different issues of crowd control than exist in a bank or a public event, i.e., moving a large number of people from point A to point B under the constraints of a timetable. Kennish's failure to review relevant literature and studies is particularly unjustifiable in light of his admission that he was aware such studies exist.

Third, Kennish's suggested security improvements were essentially hypothetical suggestions, because he gave no thought to the feasibility or cost of the proposed measures, nor did he even attempt to test his conclusions or to quantify the resulting improvement on safety. *See Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (affirming the exclusion of the testimony of an expert who did not visit the scene of the accident, did not familiarize himself with the problem, and

---

[3]Maguire argues that Kennish's failure to observe the scene goes to the weight, not the admissibility, of the testimony. Maguire states that "Kennish, of course, examined photographs of the exact location where Plaintiff was injured" (Pl's Mem. in Opp. at 12), and cites *Nutrasweet Co. v. X-L Eng'g Co.*, 227 F.3d 776 (7th Cir. 2000) for the proposition that the thoroughness of a site inspection goes to weight, not admissibility. Maguire misreads *Nutrasweet*, in which the court concluded that photographic analysis was "a well-accepted technique" in the expert's field. *Id.* at 788-89. Maguire has made no such showing here. Moreover, even if photographic analysis were sufficient, Kennish testified that he did not rely on the photographs in forming his opinions. (Kennish Dep. at 15-16.)

8

who did not establish that his conclusion was feasible). While an expert's opinion may take the form of hypothetical situations, those hypotheticals "must themselves have 'analytically sound bases' so that they are more than mere 'speculation by the expert.'" *Smith*, 215 F.3d at 719 (citation omitted). Kennish's failure to even contemplate the proper wording of proposed warning signage is sufficient reason to reject his conclusions on that issue. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) (holding that an expert's failure to draft a proposed warning "renders his opinion akin to 'talking off the cuff' and not acceptable methodology"); *accord Dhillon*, 269 F.3d at 870.

Kennish's testimony also fails to apply his methodology and conclusions to the facts of the case; he did not reliably connect Amtrak's failure to implement his suggested safety procedures with the assault on Maguire. For example, Kennish testified that allowing fewer passengers onto the platform would have prevented the incident by reducing Stevens's frustration, but he gave no basis for concluding that Stevens's actions were the result of frustration caused by the existence of an abundance of passengers on the platform. (*Cf.* Maguire Dep. at 95, 101.) He did not explain why, given that other testimony indicated that Maguire was surrounded only by Stevens and two other passengers (*see id.* at 92), Maguire was "overwhelmed" and had "lost control of the situation" prior to being assaulted by Stevens. Kennish also did not describe how the assault would have been deterred by the presence of cameras, security personnel, or warning signs. Finally, Kennish's testimony regarding the importance of having a functioning radio did not take into account Maguire's deposition testimony that she had in fact been in radio contact with the gate attendant prior to the assault. (*Id.* at 84-87.)

Lastly, even if Kennish's conclusions were found to be reliable under Rule 702, they would not necessarily help the trier of fact to understand the evidence or an issue of fact in the case. It is within an average juror's comprehension that security personnel and cameras generally improve safety and that a greater number of people in a given area may cause more frustration and security problems than would a smaller number of people. Kennish's unsupported and unquantified

9

conclusions would not add to the jury's understanding. *See Ancho*, 157 F.3d at 519 ("[A]n expert, if he is to give testimony to assist jury members and expand their knowledge . . ., must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury."); *accord Dhillon*, 269 F.3d at 871.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Bar Testimony of John Kennish is GRANTED. The matter is set for status on April 25, 2002 at 9:00 a.m.

E N T E R:

*Nan R. Nolan*
**Nan R. Nolan**
**United States Magistrate Judge**

Dated: 3/27/02